WILLIAM E. BLOOMER vs. THE STATE OF MARYLAND.

*Conspiracy—Admissibility of Evidence in reference to Conspiracy—Order of introducing Evidence—Relevancy—Ex post facto declarations—Motion to strike out Evidence rejected—How far facts occurring out of the State are Admissible, as bearing on the question of Conspiracy in Maryland—Effect of the acquittal of one of the Conspirators by the Court of another State—Corroboration of a witness by Evidence of his own unsworn declarations—Motion to exclude Evidence as not sufficient in law to support the counts of an Indictment, Equivalent to a Demurrer to Evidence—Question as to the power of the Court to instruct the Jury upon the insufficiency of the Evidence to support a charge of Conspiracy to defraud—Conspiracy a mixed question of law and fact.*

W. E. B. and U. W. D. were indicted for conspiring with others whose names were unknown, to cheat and defraud the C. B. & Q. R. R. Co. 1st, by fraudulently filling up and selling blank cards or tickets of said company. 2nd, by fraudulently procuring such blank cards or tickets for the purpose of filling up, and selling them. 3rd, by conspiring to obtain and acquire fraudulently from said company divers large quantities of cards, tickets, &c., called "Annual Passes," of great value, and to cheat and defraud it thereof. At the trial the State offered evidence tending to prove that an officer of the C. B. & Q. R. R. Co. and of the B. & M. R. R. Co. having in his possession certain *blank* annual passes over said roads to be filled up and used by him in the course of his official duties, lost the same in Washington about the middle of January, 1877. And proved that a pass over the one road did not authorize the holder to travel over the other. The witness identified one of the passes of the C. B. & Q R. R. shown him, as one of those stolen from him, and testified that no one had any authority to use those passes in the form in which the one shown him was; and that witness had not filled up any of them when they were stolen from him, or authorized any one to fill them up. They were entirely blank, &c. The State

then offered three B. & M. R. R. annual passes in evidence and proposed to show they were passes, precisely of the same character and in possession of the witness for the same purposes as to the B. & M. R. R., as the others already given in evidence in respect to to the C. B. & Q. R. R., and that no one but witness had authority to issue said B. & M. R. R. passes, and that they were never issued by him, but were stolen from him at the same time with the passes of the C B. & Q. R. R. already given in evidence. It was represented by the State that this proof would be followed by evidence tracing the B. & M. R. R. passes into the hands of the traversers for the purpose of unlawfully dealing with them, and showing they did unlawfully and fraudulently deal with them. On objection, it was HELD:

That this evidence was admissible for the purpose of showing, in connection with the evidence before given and thereafter to be given, that the traversers fraudulently obtained and had in their possession and dealt with the C. B. & Q. passes, in respect to which the conspiracy was charged in the indictment.

The State's witness T. having testified on his cross-examination that a certain railroad pass No. 64, shown to him and filled up "H. M. B. & one," "is now numbered 64, but under that number you will find the number 38 rubbed out," the traversers moved the Court to exclude the same from the jury until it was first shown "that the traversers combined with others to make said alteration, or that said alteration was made by one or the other of them in execution of such previous conspiracy to do the acts charged in the indictment." HELD:

1st. That the alteration of the passes being one of the fraudulent acts charged in the indictment, it was competent for the State to prove the facts charged in any order it chose, but the State would have to prove before the traversers could in any way be held responsible. that they conspired and agreed together to make said improper use of the tickets, and that it was done by conspiracy.

2nd. That before any act can be evidence against a man, it must be shown to be an act done by himself or another acting by his authority or in pursuance of a common design.

3rd. That sometimes for the sake of convenience the acts or declarations of one are admitted in evidence before sufficient proof is given of conspiracy, the prosecution undertaking to furnish such proof in a subsequent stage of the cause.

4th. That this mode of proceeding is in the discretion of the judge, and in seditions or other general conspiracies is seldom permitted except under particular and urgent circumstances.

5th. That the detached acts of the different persons accused, including their written correspondence, entries made by them, and other documents in their possession relative to the main design, will sometimes from necessity be admitted *as steps* to establish the conspiracy itself.

6th. That on this subject it is difficult to establish a general inflexible rule, but each case must in some measure be governed by its own peculiar circumstances.

7th. That as to the competency of the proof objected to *per se*, the filling up or alteration of the pass was an index or badge of fraud of a very significant character, which connected with the fact of its being stolen, conduced to prove the fraudulent design of some one, whoever it was that made the alteration. It was a circumstance which might be linked with other facts yet to be developed to sustain the charges made in the indictment; and was properly admissible on the condition that such proof would be supplied.

The evidence showed that the pass in blank had been sold by B., one of the traversers, to W. in March, 1877, in the City of Philadelphia. Between March and May, another person G., at the request of W., in Camden, N. J. filled in the pass with the name "H. M. B. and one." In May, G. visited Baltimore, where in an interview with B. conversing about passes of the C. B. & Q. R. R., B. inquired about the pass he had sold W., and expressed a wish to buy it back again. HELD:

1st. That the inquiry of B. about the pass and his solicitude to buy it back again, was an acknowledgment of his complicity in the unlawful dealing with the pass, and his fraudulent purpose in disposing of it.

2nd. That although *ex post facto* it was an admission as conclusive, as if it had preceded the event, and the testimony as to the filling up the blank by G. subsequently to its sale to W., and a conversation between B. and W. in Philadelphia, in regard to the sale of the pass, testified to by G., and the subsequent interview between B. and G. in Baltimore, were properly admissible in evidence.

The traversers then moved the Court to reject all the evidence tending to show a conspiracy between B. and W. in Philadelphia or Camden, unless the State should undertake to show some connection between the transactions, and the traversers or one of them in Maryland. This motion being met by a proffer on the part of the State to prove, 1st, Dealings between W. and the traverser D., (the latter acting in Baltimore,) in regard to the sale and purchase of C. B. and Q. passes after the Camden transaction. 2nd. Dealings between D. and B. in Baltimore in regard to one of those passes after the Camden transaction. 3rd. That D. sold one of the tickets in Baltimore subsequent to the transaction at Camden. It was HELD:

1st. That the motion to strike out was properly rejected.

2nd. That grouping all the facts together they tended to prove a common design, concert of action, and co-operation between the parties concerned in unlawfully and collusively dealing with the species of property as charged in the indictment.

3rd. That the fact that the sale and filling in the pass occurred out of the State could not affect their admissibility as evidence of a conspiracy in Maryland, the operation in Philadelphia not being offered to prove an offence *per se*, but as circumstances tending to show a privity between the traversers and W. in the business of buying and selling and filling in blank passes.

4th. That in cases of combinations and conspiracies the fields of operations may embrace several States as the necessities of the conspirators require. Yet the State in which all or any of them reside, and in which the conspiracy originated or was conducted has ample jurisdiction, otherwise the offence would be committed with impunity.

The traversers in order to rebut the evidence tending to prove a conspiracy between B. and W., offered in evidence a record of acquittal of W. in Camden, N. J., upon an indictment in which he was charged among other things with conspiracy with B. and others to defraud the C. B. & Q. R. R. Co., as charged in the indictment. On objection, it was HELD:

That the trial and acquittal in New Jersey, could not deprive this State of jurisdiction over offences committed within its borders.

The witness G. examined in chief on behalf of the State testified to his purchase of a certain blank pass from D. in Baltimore, on certain terms. The traversers in the course of the examination of their witnesses elicited evidence tending to contradict G. and discredit him. Whereupon the State, to rebut this testimoney offered to prove that G. upon his return to Philadelphia soon after his interview with D. in Baltimore, stated substantially the same facts as to the purchase of the pass from D., as he had detailed in his evidence before the jury. On objection, it was HELD:

1st. That the evidence was admissible for the purpose of corroborating or supporting the credibility of the witness sought to be impeached.

2nd. That the rule admitting this class of evidence should not be extended but applied strictly.

At the close of the testimony the traversers moved the Court to exclude from the jury all the evidence upon which the State relied to support the several counts of the indictment, because the said evidence was not "sufficient in law to support said counts or either of them." HELD:

1st. That this was equivalent to a demurrer to the evidence, by which the Court is called upon to declare what the law is upon the facts shown in evidence.

2nd. That if the Court had the power there was no legal standard to which they could appeal, to reach the conclusion involved in the motion.

Conspiracy is a mixed question of law and fact; a deduction to be drawn from an infinite number of particulars which the jury alone are competent to make, and where there is a *prima facie* case it is the duty of the Court to leave it to the jury to say whether the evidence is sufficient in law, and in fact to prove the offence charged.

APPEAL from the Criminal Court of Baltimore City.

The case is stated in the opinion of the Court. The exceptions, eight in number, are sufficiently set out in the opinion. A verdict of guilty was rendered against the traverser, William E. Bloomer, but as to the traverser, Upton W. Dorsey, the jury being unable to agree, were discharged. The traverser, Bloomer, appealed.

The cause was argued before BOWIE, STEWART, BRENT, MILLER, ALVEY and ROBINSON, J.

*Charles Marshall,* for the appellant.

*Bernard Carter* and *S. Teackle Wallis,* for the appellee.

*Charles J. M. Gwinn, Attorney-General,* filed a brief on behalf of the appellee.

BOWIE, J., delivered the opinion of the Court.

The appellant, William E. Bloomer, and Upton W. Dorsey, were indicted in the Criminal Court of the City of Baltimore, for conspiracy with others whose names are unknown, to cheat and defraud the Chicago, Burlington & Quincy Railroad Company, etc.

The first count charged, that being in possession of certain cards or tickets of the Chicago, Burlington & Quincy Railroad, which contained blank spaces for filling in or writing the name of the person to whom they might have been properly issued and granted, they, together with others unknown, conspired and agreed to fraudulently fill in and insert the names of divers persons, etc., and did fill in and insert the names of divers persons in said cards or tickets, and sell and dispose of the same with intent to cheat and defraud the said Chicago, Burlington & Quincy Railroad Company.

The second count charges, that the said Dorsey and Bloomer with divers others, etc., conspired together to cheat and defraud the Chicago, Burlington & Quincy Railroad Company, by fraudulently and wrongfully procuring a large number of cards, tickets, etc., in and upon which no name had been written, and which had not been issued, with intent to have them filled up and sell and dispose of the same, and to cheat and defraud the said Company.

The third charges the same persons with conspiring to obtain and acquire from the Chicago, Burlington & Quincy Railroad Company, divers large quantities of cards, tickets, etc., called "annual passes," of great value, and to cheat and defraud it thereof.

To which the traversers plead not guilty. The jury returned a verdict of guilty as to Bloomer, and being unable to agree as to Dorsey, were discharged.

Several exceptions having been taken upon questions of evidence on the trial, the traverser, Bloomer, appealed.

The State having given evidence tending to prove that an officer of the Chicago, Burlington & Quincy Railroad Company, and of the Burlington & Missouri Railroad, having in his possession certain *blank* annual passes over said roads, six of each, to be filled up and used by him, in the course of his official duties in travelling over the same, lost the same in Washington, about the middle of

January, 1877, and having proved that a pass over the *one road,* does not authorize the holder, to travel over the other, but each requires a different pass, the witness identified one of the passes of the Chicago, Burlington & Quincy Railroad, shown him as one of those stolen from him, and testified that no one had any authority to use those passes, in the form in which the one shown him was. "To make the pass properly available, the blank space on its face must be filled up with the name of the person using it, by the proper officer of the Company." * * * *

"No one but witness had authority to fill up and issue the passes of the C. B. & Q. Railroad, that witness had with him at Washington. Witness had not filled up any of them when they were stolen from him, or authorized any one to fill them up ; they were entirely blank," etc.

The State then offered three Burlington & Missouri River Railroad annual passes in evidence, and proposed to show they were passes precisely of the same character, and in possession of the witness, for the same purposes as to the Burlington & Missouri River Railroad, as the others already given in evidence in respect to the Chicago, Burlington & Quincy Railroad, and that no one but witness had authority to issue said B. & M. R. Railroad passes, and that they were never issued by him, but were stolen from him at the same time with the passes of the C. B. & Q. Railroad, already given in evidence. It was represented by the State, that this proof would be followed by evidence, tracing the B. & M. R. Railroad passes into the hands of Bloomer and Dorsey, for the purpose of unlawfully and fraudulently dealing with them, and showing they did unlawfully and fraudulently deal with them.

The object or purpose of this offer was to show in connection with the evidence before given, and thereafter to be given, that the traversers fraudulently *obtained, and had in their possession, and dealt with the Chicago, Burlington*

*and Quincy* passes, in respect to which the conspiracy is charged in the indictment, and in manner and form as therein charged.

The traversers objected to the admission of the testimony offered, unless the State proposed to follow the same, by proof that the B. & M. R. R. passes, were obtained and dealt with by the traversers, "in pursuance of a confederation or combination between the traversers, and for the purpose of defrauding the C. B. & Q. R. R., as set forth in the indictment."

The Court overruled the objection, and allowed the evidence offered, to be given according to the tenor of said offer. To which ruling the traversers excepted. It is urged on their behalf, that this was equivalent to an attempt to establish *a conspiracy*, to deal unlawfully with the passes of one road, by showing a like conspiracy as to the passes of another.

The legal grounds of this exception are, that the testimony offered, does not tend to prove the matters in issue, and the facts are collateral to the charges in the indictment.

The elementary rule of evidence, that the testimony must be confined to the points in issue, is based not only on the reason, "that such evidence tends needlessly to consume the public time, to draw away the minds of the jurors, and to excite prejudice and mislead," but, "moreover, that the adverse party, having had no notice of such evidence, is not prepared to rebut it." 1 *Taylor's Ev.*, sec. 298. We are admonished by this distinguished author, that "The due application of this rule, will occasionally tax to the utmost, the firmness and discrimination of the Judge ; so that, while he shall reject as too remote, every fact which merely furnishes a fanciful analogy, or conjectural inference, he may admit as relevant, the evidence of all those matters which shed a real, though perhaps an indirect and feeble light on the question in issue." *Ibid.*

The object of the evidence excepted to, was to prove, in connection with the evidence previously submitted, and that proposed to be submitted, that the traversers fraudulently obtained and had in their possession, the Chicago, Burlington and Quincy Railroad passes, in respect to which the conspiracy is charged in the indictment.

In other words, to establish a fraudulent intent, by proving possession of passes of the same kind and description over another railroad, which were stolen at the same time, and from the same person.

The most recent, and well considered authorities, establish we think, beyond question, the admissibility of such evidence in analogous cases.

In prosecutions for the utterance of forged instruments, it has been held competent to prove that the traverser had about the same time in his possession, other forged instruments than those which were the subject of the indictment. 3 *Greenleaf's Ev.*, sec. 111; *Rex vs. Wylie,* 1 *New Rep.*, 91; 1 *Leading Crim. Cases,* 185, and cases cited in *note* 1.

In *Wood vs. The U. S.,* 16 *Peters,* 360, in a libel for violating the Revenue Laws, by the use of false invoices, the Supreme Court, by the late Mr. Justice STORY, held that fraud might be deduced from other invoices of the plaintiff in error, of goods imported before and after the importation of the goods in question.

That learned Jurist said, it was an exception to the general rule, excluding evidence not directly comprehended within the issue; or rather, perhaps it may with more certainty be said, the exception is necessarily embodied in the very substance of the rule; for whatever does legally conduce to establish the points in issue, is necessarily embraced in it, and therefore a proper subject of proof, whether it be direct or presumptive. *Vide* also *The King vs. Wylie,* 4 *Bos. & Pul.,* 92; *United States vs. Wood,* 14 *Peters' Rep.,* 430. There are some decisions

to the contrary, but the ruling of the Court below, in our opinion, is sustained by a great preponderance of reported cases in England and the United States.

Besides the special exception set forth in the first bill of exceptions, the traversers *reserved a general exception, to all the evidence, and the right to move the Court to exclude it from the jury, if the whole evidence should not be legally sufficient to support the indictment.*

The State's witness, Tonzaline, having testified on his cross-examinatson, that a certain railroad pass, No. 64, shown to him, and now filled up, "H. M. Beidler and one," is now numbered 64, but under that number, you will find the number "38 rubbed out," the traversers moved the Court to exclude the same from the jury, "until it is first shown that the traversers combined or conspired with others, to make said alteration, or that said alteration, was made by one or the other of them, in execution of such previous conspiracy to do the acts charged in the indictment."

Which motion the Court overruled, and the traversers excepted.

The action of the Court below is based upon the theory, that the alteration of the passes is one of the fraudulent acts charged in the indictment, and it is competent to the State to prove the facts charged in any order it chooses; "but the State will have to prove before the traversers can in any way be held responsible, that they conspired and agreed together to make this improper use of the tickets, and that it was done by conspiracy." This exception involves the admissibility of the evidence of alteration "*per se,*" as well as the order of its admission.

Before any act can be evidence against a man, it must be shown to be an act done by himself, or another, acting by his authority, or in pursuance of a common design.

The text books on Evidence speaking of the acts and declarations of one of a company of conspirators, say:

" A foundation should first be laid by proof sufficient in the opinion of the Judge to establish *prima facie,* the fact of conspiracy between the parties, or at least proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprize being thus shown, every act and declaration of each member of the confederacy in pursuance of the original concerted plan, and with reference to the common object, is in contemplation of law, the act and declaration of them all." *Vide R. vs. Stone,* 6 *T. R.,* 528, 529; 25 *How. St. Trials,* 1277, 1313, *S. C.,* 2 *Pet.,* 358, 365; *Crowninshield's Case,* 10 *Pick.,* 497; *U. S. vs. Gooding,* 12 *Wheat.,* 469; *Com. vs. Eberle,* 3 *Ser. & R.,* 9, cited 1 *Taylor's Evidence, note* 1, *p.* 540.

This learned writer qualifies this general rule in the next section, as follows : " Sometimes for the sake of convenience the acts or declarations of one are admitted in evidence, before sufficient proof is given of conspiracy; the prosecutor undertaking to furnish such proof in a subsequent stage of the cause. But this mode of proceeding rests in the discretion of the Judge, and in seditions or other general conspiracies is seldom permitted, except under particular and urgent circumstances; for otherwise, the jury might be misled to infer the fact itself of the conspiracy from the declaration of strangers. Still, as a conspiracy need not be established by proof which actually brings the parties together, but may be shown like any other fact by circumstantial evidence, the detached acts of the different persons accused, including their written correspondence, entries made by them, and other documents in their possession relative to the main design, will sometimes from necessity be admitted as *steps* to establish the conspiracy itself. On this subject it is difficult to establish a general inflexible rule, but each case must in some measure be governed by its own peculiar circumstances." The Court below seems to have adopted the order of pro-

Bloomer *vs.* State.

ceeding sanctioned by the last citation, admitting the evidence provisionally, not absolutely. There was, therefore, no violation of principle or practice, as to the order of evidence, in admitting the testimony.

As to the competency of such proof "*per se,*" the filling up or alteration of the pass, was an index or badge of fraud of a very significant character, which connected with the fact of its being stolen conduced to prove the fraudulent design of some one, whoever it was that made the alteration; it was a circumstance which might be linked with other facts yet to be developed to sustain the charges made in the indictment. It was admitted only on condition that such proof would be supplied—and such ruling was correct.

The State having called one Edwin B. Giles, who testified, that he lived in Camden, and knew the traverser Bloomer, and looking at pass, (No. 64,) was asked whether or not he was present at an interview between Bloomer and any one in reference to the same? In reply the witness said: "Sometime early in the year 1877, he happened to be in a ticket office in Philadelphia, and while there Bloomer and Wilson were bargaining over a pass."

Being asked what he had to do with the pass, he testified, that Wilson told him he had bought it, and being in the printing office of Wilson one evening, he was called to fill in a pass; it was blank when it was handed him, and being asked, " who filled up the name ' H. M. Beidler and one,' " objection was made by the traverser. Whereupon the Court withholding its decision as to the objection, and in order to pass upon the question raised, examined the witness and permitted the counsel for the State to examine him in the presence of the jury, as to the conversation he heard between Bloomer and Wilson in Philadelphia, and subsequent interviews between him and Bloomer in Baltimore, etc.

After consideration the Court overruled the objection to the question above stated, and allowed the witness to state it was filled up by him in the manner above stated, (*i. e.* under the direction of Wilson,) to which ruling as well as to the admission of the whole evidence given in answer to the questions propounded by the Court, and by the counsel for the State subsequent to the objection of the traversers, the traversers excepted.

This exception constituting the third of the traversers', presents the admissibility of the act of Giles in Camden, in filling up ticket No. 64, under the orders of Wilson, as evidence.

Unless connected by antecedent or subsequent testimony, it was "*res inter alios acta.*" It had been proved that Bloomer had that pass in Maryland, that a negotiation for the sale and purchase of a pass occurred in Philadelphia, and that afterwards pass No. 64, being then in blank, was filled in in Camden, New Jersey, by Giles acting under the orders of Wilson.

The negotiation in Philadelphia between Bloomer and Wilson occurred in March, 1877 ; between March and May, Giles filled in the pass in Camden by the order of Wilson. In May, Giles visited Baltimore, where in an interview with Bloomer, conversing about passes of the Chicago, Burlington & Quincy Railroad, Bloomer inquired about the pass he had sold Wilson, wanted to know who Wilson had sold it to, and expressed a wish to buy it back again. Bloomer undoubtedly sold this pass to Wilson to be sold again ; it could not be sold unless it was filled up ; it was filled up by Giles under the orders and in the presence of Wilson.

Thus, upon the principle, that a man contemplates the necessary consequences of his own act, the act of Giles in filling the pass under the order of Wilson, was the act of Bloomer.

The inquiry of Bloomer about the pass, and his solicitude to buy it back, (however commendable "*pro con-*

*scientœ*,'') was an acknowledgment of his complicity in
the unlawful dealing with the pass, and his fraudulent
purpose in disposing of it.   Although " *ex post facto*," it
was an admission, as conclusive as if it had preceded the
event.   The ruling of the Court, in our judgment, in
admitting the testimony, was in strict compliance with the
rules of evidence.

The traversers then moved the Court to reject all evidence
tending to show a conspiracy between Bloomer and Wil-
son in Philadelphia or Camden, unless the State should
undertake to show some connection between the transac-
tions and the traversers, or one of them in Maryland.

This motion was met by a proffer on the part of the
State, to prove,

1st. Dealings between Wilson and Dorsey, (the latter
acting in Baltimore,) in regard to the sale and purchase
of C. B. & Q. passes, after the Camden transaction.

2nd. Dealings between Dorsey and Bloomer in Baltimore,
in regard to one of those passes, after the said transaction.

3rd. That Dorsey sold one of those tickets in Baltimore
subsequent to the transaction at Camden.

The Court conceding that the facts as to Bloomer and
Wilson as far as proved, were extra-territorial, yet held that
the testimony of Giles taken in connection with that pro-
posed to be given, had a double aspect, it tended to show
a conspiracy between Bloomer and Wilson in Philadelphia,
also an improper dealing by Bloomer with the pass ; and
followed by the testimony proposed to implicate Dorsey,
would be a proper step to show that Bloomer conspired
with Dorsey, in Maryland, and was therefore admissible,
" *subject to be ruled out on motion* of the defendant, if the
State failed to prove a conspiracy in Maryland."

The Court therefore rejected the motion to strike out,
and the traversers excepted.

The counsel of the traversers contend that the transac-
tions in Philadelphia and Camden, were isolated, indepen-

dent transactions, which no subsequent facts disclosed in the testimony rendered admissible. There is great force in the objection regarding the testimony referred to, in that view, but grouping all the testimony together it tends to prove that soon after the loss of the tickets in Washington, one of them was in the possession of Bloomer in Philadelphia, who sold it there to Wilson, of Camden; that Wilson had it filled up and sold it; that Dorsey and Bloomer were dealing in similar tickets in Baltimore, in May; that Bloomer said there was trouble about them and was anxious to recover the one he had parted with. These facts tend to prove a common design, concert of action and co-operation between the parties concerned, in unlawfully and collusively dealing with the species of property, as charged in the indictment.

The fact that the sale and filling in of the pass occurred out of the State could not affect their admissibility as evidence of a conspiracy in Maryland. The operations in Philadelphia and Camden were not offered to prove an offence (*per se*) which was only cognizable by the Courts of the States where they transpired. They were used as circumstances tending to show a privity between Bloomer and Wilson and Dorsey, in the business of buying and selling and filling in blank passes.

Combinations and conspiracies can only be established by a number of indefinite circumstances which vary according to the objects to be accomplished. Their fields of operations sometimes embrace various States, as the necessities of the conspirators require. Yet the State in which all or any of them reside, and in which the conspiracy originated or was conducted, has ample jurisdiction; otherwise the offence would be committed with impunity.

The State having rested, the traversers proceeded to examine several witnesses on their part.

In order to rebut the evidence admitted by the Court as before set forth in the fourth and fifth exceptions, tending

to prove a conspiracy between Bloomer and Wilson, the traversers offered in evidence a record of the acquittal of Sylvester F. Wilson, in Camden, N. J., upon an indictment in which he was charged, among other things, with conspiracy with Bloomer and others, to defraud the Chicago, Burlington and Quincy R. R. Co., as set forth in the record.

Which evidence the Court rejected and the traversers excepted.

It is said in a work of high authority, "Where one of several defendants charged with a conspiracy had been acquitted, it was held that the record of acquittal is evidence for another defendant subsequently tried." 2 *Amer. Crim. Law, sec.* 2342 ; *Rex vs. Horne Tooke, Old Bailey,* 1794; *Burns' Justice, tit. Conspiracy.*

This must of course mean an acquittal by a Court of competent jurisdiction, in the same State in which the subsequent prosecution was pending, and for the same offence. As conspiracy is the consent of two or more minds, where two only are charged, the acquittal of one must be the acquittal of both.

The record excepted to, is not embodied in the bill of exceptions before us, but we must presume the indictment charged an offence committed in the State of New Jersey.

The offence charged in the case before us, is an offence against the State of Maryland ; transactions in the State of New Jersey, were given in evidence, as the consummation of the conspiracy formed in Maryland.

These may, or may not have constituted the ground of the prosecution in New Jersey ; but however that might be, the trial and acquittal in New Jersey, could not deprive this State, of jurisdiction over offences committed within its borders.

No authority has been cited by the appellant's counsel, to sustain this exception, and we conclude none could be found.

The ruling of the Court below upon the sixth and seventh exceptions, involves substantially the same question, viz.,

The admissibility of the unsworn statements or declarations of a witness, as to the same transaction, to corroborate his evidence given at the trial.

The witness, Giles, examined in chief, in behalf of the State, had testified to his purchase of a certain blank pass of Dorsey, at the St. Clair Hotel, in Baltimore, on certain terms.

The traversers in the course of the examination of their witnesses. elicited evidence tending to contradict Giles, and discredit him ; whereupon the State, to rebut this testimony, offered to prove by Messrs. Ives and Franklin, that Giles upon his return to Philadelphia, soon after his interview with Dorsey in Baltimore, stated substantially, the same facts as to the purchase of the pass of Dorsey, as he had detailed in evidence before the jury.

The admissibility of this species of evidence, has been very deliberately sanctioned by this Court, in the cases cited by the State, 30 *Md.*, 104 ; 35 *Md.*, 439, and recognized again in the case of *Maitland vs. The Citizens' N. B. of Balto.*, 40 *Md.*, 540.

It is said to be an exception to the general principle, which excludes all mere hearsay evidence, because *ex parte*, and without the sanction of the oath. It is not admitted to prove or disprove any fact involved in the issue on trial, but simply to corroborate or support the credibility of the witness, who may be in some manner impeached. "It is a rule, however, not very generally recognized in the Courts of England, or of the other States of this country, and it should not be extended, but applied strictly."

The whole testimony having been offered and received by the Court, subject to exception reserved by the traversers, and each of them to its legal sufficiency and admissibility, and subject to the right reserved by them, and

each of them to move the Court to exclude it from the jury, the traversers in pursuance of said exception, and in exercise of the right so reserved, submitted three several motions, viz.,

1st. To exclude from the jury all the evidence in the case, upon which the State relies to support the first count in the indictment.

2nd. To exclude from the jury the evidence upon which the State relies to support the second count.

3rd. To exclude from the jury, all the evidence upon which the State relies to support the third count.

" Because they say that the said evidence is not sufficient in law, to support said counts, or either of them."

These motions are equivalent to a demurrer to the evidence, by which the Court is called on to declare what the law is upon the facts shown in evidence, analagous to a demurrer upon facts alleged in pleading. 2 *Stephen's N. P.*, 1791 ; *Copeland vs. New England Ins. Co.*, 22 *Pick.*, 135.

It is urged on behalf of the State, that these motions infringe the injunction contained in the 5th section of Art. 15, of the Constitution of this State, which declares that in the trial of all criminal cases, the jury shall be the judges of law as well as of fact.

This question was incidentally presented to this Court, in the case of *Wheeler vs. The State*, 42 *Md.*, 569, in which case, after the jury had retired, and finding themselves unable to agree, they made application to the Court in writing for instruction on a given point; the Court answered the inquiry in writing, and the counsel of the prisoner objected to the sending of the reply, and insisted that if any instruction were given the jury at that stage of the case, the jury should be brought into Court and there instructed on the law of the case.

Commenting on the exception to the act of the Court below, this Court said, " The jury are made the judges of

law, as well as of fact, in the trial of criminal cases, under the Constitution of this State ; and any instruction given by the Court, as to the law of the *crime*, is but advisory, and in no manner binding upon the jury, except as to questions as to what shall be considered evidence.''

More recently, the question was presented directly, in the case of *Broll vs. The State*, 45 *Md.*, 359. In this case after the close of the evidence, the appellant asked the Court to instruct the jury that if they should find certain facts, then the appellant was not answerable, and should not be convicted on the fifth and sixth counts of the indictment. The other counts had been abandoned by the State. The Circuit Court refused to grant the instruction, giving as its reason therefor that the jury being, by the Constitution, judges of the law in criminal cases tried by them, the Court declines to instruct them in this case.

This Court, affirming that decision upon appeal, add, ''The jury then, being judges of law, as well as of fact in · criminal cases, would not be bound by any instructions given by the Court, but would be at perfect liberty to utterly disregard them and find a verdict in direct opposition to them.''

'' No Court in this State can be *required* by the counsel or jury to give instructions either upon the law or *the legal effect of the evidence* given at the trial.''

The motions of the appellant require the Court to pronounce and decide upon the legal effect of the evidence.

They affirm the evidence should be excluded from the jury, because it is not sufficient in law to support such counts.

These motions are not based upon the inadmissibility of the evidence, its want of relevancy, or continuity, the absence or omission of any particular fact, necessary to complete the chain, but they propose to the Court to say virtually, the traversers shall be discharged without day, and the jury withdrawn.

If the Court had the power, there is no legal standard to which they could appeal to reach such a conclusion.

Conspiracy, is a mixed question of law and fact, a deduction to be drawn from an infinite number of particulars, which the jury alone are competent to make, and when there was a *prima facie* case, it was the duty of the Court to leave it to the jury to say, whether the evidence was sufficient in law and in fact to prove the offence charged.

Finding no error in the several rulings of the Court below, the same will be affirmed..

> *Rulings affirmed, and*
> *cause remanded.*

(Decided 3rd May, 1878.)

STEWART, J., dissented.